**USCA No.: 23-10180-C**
USDC No. 9:21-cv-81223-RS

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

SCHUMACHER GROUP, INC.
*et al.*,

        Appellants,

vs.

LANCE SPIKES, *et al.*,

        Appellees.

---

**On appeal from the United States District Court
for the Southern District of Florida
District Court Case No. 9:21-cv-81223-RS**

**INITIAL BRIEF OF APPELLANTS SCHUMACHER GROUP, INC.,
CHARLES A. SCHUMACHER, AND AMANDA SCHUMACHER**

---

PADULA BENNARDO LEVINE, LLP

**PADULA BENNARDO LEVINE, LLP**
**DANIEL R. LEVINE, ESQ.**
**ROBIN I. FRANK, ESQ.**
**ALEX B.C. ERSHOCK, ESQ.**
*Counsel for Appellants Schumacher Group, Inc.,
Charles A. Schumacher, and Amanda Schumacher*
3837 NW Boca Raton Blvd., Suite 200
Boca Raton, FL 33431
Telephone: (561) 544-8900
Facsimile: (561) 544-8999

**BIRNBAUM, LIPPMAN & GREGOIRE, PLLC**
**NANCY W. GREGOIRE STAMPER, ESQ.**
*Counsel for Appellants Schumacher Group, Inc., Charles A. Schumacher, and Amanda Schumacher*
1301 E. Broward Blvd., Suite 230
Fort Lauderdale, FL  33301
Telephone:   (954) 617-2300
Facsimile:    (954) 617-2313

**LAW OFFICE OF RICHARD IVERS**
**RICHARD A. IVERS, ESQ.**
*Counsel for Appellants Schumacher Group, Inc., Charles A. Schumacher, and Amanda Schumacher*
6131 Lyons Road, Suite 201
Coconut Creek, FL  33073-4739
Telephone:   (954) 757-6262
Facsimile:    (954) 757-6594

## CERTIFICATE OF INTERESTED PERSONS

Appellants submit this complete list, as known to this filer, of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party as follows:

Cortes, Michael – Plaintiff-Appellee

Cullen, Catherine A. – counsel for Plaintiffs-Appellees

Cullen, Mark A. – counsel for Plaintiffs-Appellees

Ershock, Alex B.C. – counsel for Defendants-Appellants

Frank, Robin I. – counsel for Defendants-Appellants

Gregoire Stamper, Nancy W. – counsel for Defendants-Appellants

Hollman, Marjorie – Plaintiff-Appellee

Ivers, Richard A. – counsel for Defendants-Appellants

Levine, Daniel R. - counsel for Defendants-Appellants

Maynard, Hon. Shaniek M. – United States Magistrate Judge

Padula Bennardo Levine LLP – counsel for Defendants-Appellants

Schumacher Group, Inc. - Defendant-Appellant

Schumacher, Amanda - Defendant-Appellant

C-1

Schumacher, Charles A. - Defendant-Appellant

Smith, Hon. Rodney – United States District Judge

Spikes, Lance – Plaintiff-Appellee

The Cullen Law Firm, P.A. – counsel for Plaintiffs-Appellees

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a)(1) and 11th Cir. R. 28-1(c), Appellants desire oral argument. The issues in this case are unique – interpretation of provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq*., requiring employers to pay overtime to covered employees for all hours worked in excess of 40 hours a week. The two provisions at issue are:

(1) the "Automobile Sales Exemption," 29 U.S.C. § 213(b)(10) ("ASE"), which exempts from the overtime pay requirement any salesperson primarily engaged in selling automobiles if employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles to ultimate purchasers; and

(2) the "7(i) Retail Sales Exemption," 29 U.S.C. § 207(i) ("7(i) Exemption"), which exempts from the overtime pay requirement any employee of a retail or service establishment, so long as commissions on goods or services represent more than half the employee's total compensation for a representative period and the employee's regular rate of pay exceeds one and one-half times the applicable minimum hourly rate.

These two provisions were the Appellants'[1] chief affirmative defenses. The

---

1    Together Schumacher Group, Inc., Charles A. Schumacher, and Amanda Schumacher will be referred to as the "Schumacher Defendants." Schumacher Group, Inc., will be referred to as "Schumacher Auto."

district court construed both against the Schumacher Defendants as a matter of law on cross-motions for summary judgment, holding the ASE does not apply because Appellees did not sell cars, but only *aided in* selling them, and further holding the 7(i) Exemption does not apply because Appellees were *physically* located in a building distinct from the Schumacher Auto dealerships, and thus not part of the Schumacher Auto *retail* establishment, thus construing both the provisions *narrowly* against the Schumacher Defendants despite the controlling precedent to the contrary.

The Schumacher Defendants believe the record evidence entitles them to summary judgment on the exemptions, but at a minimum, a *fair* reading of both exemptions requires denial of summary judgment to *both* parties, allowing for additional factfinding and weighing of the evidence accordingly at trial to determine the applicability of either exemption, based on the record evidence. They also believe oral argument affords them a necessary opportunity to explore these issues with the Court.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF CONTENTS ...................................................................................... iii

TABLE OF CITATIONS AND AUTHORITIES.................................................... v

STATEMENT OF JURISDICTION ........................................................................ 1

STATEMENT OF THE ISSUES ............................................................................. 2

STATEMENT OF THE CASE ................................................................................ 3

SUMMARY OF THE ARGUMENT...................................................................... 19

ARGUMENT ......................................................................................................... 23

I.    The FLSA exemptions must not be narrowly, but _fairly_, construed...... 23

II.   The district court erred in entering summary judgment for Appellees, and denying the Schumacher Defendants' motion for summary judgment, on Appellees' status as salespersons under the ASE or, alternatively, the court erred in ruling as a matter of law given the factual disputes ........................................................ 25

III.  The district court erred in holding a fair reading of the ASE does not include Appellees even though they were _integrally involved_ in the _sales process_ ....................................................................... 31

IV.   The district court erred in holding a fair reading of the 7(i) Exemption does not include Appellees because they were in a physically separate building, even though the department in which they were located was functionally unified with the automotive dealerships and therefore part of Schumacher Auto's retail establishment ................................................................................. 40

**V.    The district court erred in holding the FWW did not apply to Hollman based on its conclusion she did not have the requisite understanding regarding her pay structure** .............................................. **49**

CONCLUSION ............................................................................................ **53**

CERTIFICATE OF COMPLIANCE ....................................................... **56**

CERTIFICATE OF SERVICE................................................................. **57**

SERVICE LIST ......................................................................................... **58**

## TABLE OF CITATIONS AND AUTHORITIES

### Cases:

*A.H. Phillips, Inc. v. Walling,*
  324 U.S. 490, 493 (1945) ................................................................................. **23**

*Allen v. Tyson Foods, Inc.,*
  121 F.3d 642, 646 (11th Cir. 1997) ............................................................. **18**

*Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.,*
  515 F.3d 1150, 1158 (11th Cir. 2008) ....................................................... **48**

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242, 255 (1986) ...................................................................... **18, 25**

*Bailey v. County of Georgetown,*
  94 F .3d 152, 156 (4th Cir.1996) .................................................................. **52**

*Barrentine v. Arkansas-Best Freight Sys.,*
  450 U.S. 728, 739 (1981) ............................................................................... **24**

*Bonner v. City of Pritchard,*
  661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) .................................. **32**

*Bragg v. Bill Heard Chevrolet, Inc.,*
  374 F.3d 1060, 1066-68 (11th Cir. 2004) ............................................... **38**

*Brennan v. Deel Motors, Inc.,*
  475 F. 2d 1095-1098 (5th Cir. 1973) ................................... **31, 32, 33, 37**

*Brooklyn Sav. Bank v. O'Neil,*
  324 U.S. 697, 698, 707 n. 18 (1945) ....................................................... **23**

*Brown v. Nexus Business Solutions, LLC,*
  488 F. Supp. 3d 1287, 1292, 1303, 1307 (N.D. Ga. 2020)
  *aff'd*, 29 F.4th 1315 (11th Cir. 2022) .................................................... **39**

*Buckner v. Fla. Habilitation Network, Inc.,*
  489 F .3d 1151, 1154 (11th Cir. 2007) .................................................... **18**

*Chastain v. N.S.S. Acquisition Corp.,*
  No. 08- 81260-CIV, 2009 WL 1971621, at *4 (S.D. Fla. July 8, 2009)
  *aff'd,* 378 F. App'x 983 (11ᵗʰ Cir. 2010) ................................................................ **38**

*Chevron U.S.A., Inc. v. Natural Res. Def Council, Inc.,*
  467 U.S. 837 (1984) .............................................................. **20, 42, 43**

*Christopher v. SmithKline Beecham Corp.,*
  567 U.S. 142, 150-51, 165-66 (2012) .......................................... **38, 39**

*Corning Glass Works v. Brennan,*
  417 U.S. 188, 196-97 (1974) .................................................................. **24**

*Davis v. Friendly Exp., Inc.,*
  No. 02-14111, 2003 WL 21488682, at *2 (11ᵗʰ Cir. Feb. 6, 2003)......... **51, 52, 53**

*Diaz v. Jaguar Rest. Grp., LLC,*
  627 F.3d 1212, 1214-15 (11ᵗʰ Cir. 2010).............................................. **24**

*Dorse v. Armstrong World Indus., Inc.,*
  798 F.2d 1372, 1376-77 (11ᵗʰ Cir. 1986)................................................ **1**

*Encino Motorcars, LLC v. Navarro,*
  138 S. Ct. 1134, 1140-41, 1142-43 (2018)................ **23, 31, 33, 34, 35, 39, 40, 41**

*Ehrlich v. Rich Products Corporation,*
  767 Fed. Appx. 845, 850 n.3 (11ᵗʰ Cir. 2019) .................................... **24**

*English v. Ecolab, Inc.,*
  2008 WL 878456, at *7 (S.D.N.Y., March 31, 2008)......................... **44**

*Feagley v. Tampa Bay Downs, Inc.,*
  2012 WL 2178857, at *5 (M.D. Fla., June 13, 2012) ......................... **48**

*Fowler v. OSP Prevention Grp., Inc.,*
  38 F.4th 103 (11ᵗʰ Cir. 2022)............................................................. **24**

*Garcia v. Yachting Promotions, Inc.,*
  662 Fed. Appx. 795, 796-97 (11ᵗʰ Cir. 2016)..................................... **50**

vi

*Gieg v. DDR, Inc.,*
  407 F.3d 1038, 1047, 1049 (9th Cir. 2005)................................................**41, 42, 48**

*Griffin v. Wake County,*
  142 F.3d 712, 716-17 (4th Cir. 1998)..........................................................**51, 52**

*Hernandez v. Plastipak Packaging, Inc.,*
  15 F.4th 1321, 1326-27, 1329-30 (11th Cir. 2021)...................................**23, 49, 50**

*King v. King Motor Co. of Fort Lauderdale,*
  900 So. 2d 619, 622 (Fla. 4th DCA 2005) ............................................................**38**

*Lamonica v. Safe Hurricane Shutters, Inc.,*
  711 F.3d 1299, 1310-11 (11th Cir. 2013)..........................................................**49, 50**

*Lewis v. Keiser Sch., Inc.,*
  No. 11-62176-Civ., 2012 WL 4854724, at *5 (S.D. Fla. Oct. 12, 2012) ............**53**

*Martin v. Refrigeration School, Inc.,*
  968 F.2d 3, 5 (9th Cir. 1992) .............................................................................**43**

*Mitchell v. Gammill,*
  245 F.2d 207 (5th Cir. 1957) .............................................................................**47**

*Mitchell v. T. F. Taylor Fertilizer Works,*
  233 F.2d 284 (5th Cir. 1956) .............................................................................**47**

*Modeski v. Summit Retail Solutions, Inc.,*
  470 F. Supp. 3rd 93, 101-109 (D. Mass. 2020)..............................................**39, 40**

*Montalvo v. Tower Life Bldg.,*
  426 F.2d 1135, 1144-45 (5th Cir. 1970).............................................................**48**

*Moorman v. UnumProvident Corp.,*
  464 F.3d 1260, 1266 n. 1 (11th Cir. 2006)..........................................................**31**

*Morgan v. Family Dollar Stores,*
  551 F.3d 1233, 1269 (11th Cir. 2008)..................................................................**35**

*Overnight Motor Transp. Co. v. Missel,*
   316 U.S. 572, 580 (1942) ..................................................................... **49**

*Owens v. Samkle Auto. Inc.,*
   425 F.3d 1318, 1323 (11th Cir. 2005) ................................................. **38**

*Pendlebury v. Starbucks Coffee Co.,*
   No. 04-80521-CIV, 2008 WL 763213, at *6 (S.D. Fla. Mar. 13, 2008) ............ **24**

*Ramirez v. Statewide Harvesting & Hauling, LLC,*
   997 F.3d 1356, 1359 (11th Cir. 2021) ................................................. **23**

*Reich v. Delcorp, Inc.,*
   3 F.3d 1181, 1186 (8th Cir. 1993) ........................................................ **43**

*Rene v. Fulton County School District,* Case No. 1:19-CV-04721-WMR,
   2020 WL 7496841, *3 (11th Cir., Nov. 2, 2020) ................................... **52**

*Samson v. Apollo Resources, Inc.,*
   242 F.3d 629, 636-37 (5th Cir. 2001) ................................................... **52**

*Sec'y U.S. Dep't of Labor v. Bristol Excavating, Inc.,*
   935 F.3d 122, 135 (3rd Cir. 2019) ........................................................ **41**

*Selz v. Investools, Inc.,* No. 2:09-CV-1042-TS,
   2011 WL 285801, at *3, 4 (D. Utah Jan. 27, 2011) ...................... **42, 44**

*Skidmore v. Swift & Co.,*
   323 U.S. 134, 138 (1944) ....................................................... **20, 43, 44**

*Strickland v. Norfolk* S. *Ry. Co.,*
   692 F.3d 1151, 1154 (11th Cir. 2012) ............................... **17, 25, 30, 31**

*Viart v. Bull Motors, Inc.,*
   149 F. Supp. 2d 1346, 1348-49 (S.D. Fla. 2001) ......................... **36, 37**

*Walling v. Youngerman-Reynolds Hardwood Co.,*
   325 U.S. 419 (1945) .............................................................................. **49**

*Walthour v. Chipio Windshield Repair, LLC,*
 745 F.3d 1326, 1332 (11th Cir. 2014) ..................................................... 23

**Statutes:**

29 C.F.R. § 778.114 ................................................................................ **49, 50**

29 C.F.R. § 779.23 .......................................................................................... **44**

29 C.F.R. § 779.302 ........................................................................................ **41**

29 C.F.R. § 779.303 ........................................................................................ **44**

29 C.F.R. § 779.305 ........................................................................................ **45**

29 C.F.R. § 779.308 ........................................................................................ **42**

29 C.F.R. §§ 779.313-.321 ............................................................................. **42**

29 C.F.R. §779.319 .......................................................................................... **47**

29 C.F.R. §§ 779.339-.341 ............................................................................. **42**

29 C.F.R. § 779.355 ........................................................................................ **20**

29 C.F.R. § 779.412 ........................................................................................ **41**

29 C.F.R. § 779.414 ........................................................................................ **41**

29 C.F.R. 779.9 ............................................................................................... **44**

29 U.S.C. §§ 201 *et seq.* ................................................................................... **i**

29 U.S.C. § 202(a) .......................................................................................... **24**

29 U.S.C. § 206 ................................................................................................. **4**

29 U.S.C. § 207 ................................................................................................. **4**

29 U.S.C. § 207(a) .......................................................................................... **24**

29 U.S.C. § 207(a)(1) ........................................................................ **49**

29 U.S.C. § 207(i) ........................................................................ ***passim***

29 U.S.C. § 213 ........................................................................ **24**

29 U.S.C. § 213(a) ........................................................................ **44**

29 U.S.C. § 213(a)(1) ........................................................................ **44**

29 U.S.C. § 213(b)(10) ........................................................................ **i, 19**

29 U.S.C. § 213(b)(10)(A) ........................................................................ **4, 25, 26**

28 U.S.C. § 1291 ........................................................................ **1**

## Rules:

11th Cir. R. 28-1(c) ........................................................................ **i**

Fed. R. App. P. 32(a)(5) ........................................................................ **56**

Fed. R. App. P. 32(a)(6) ........................................................................ **56**

Fed. R. App. P. 32(a)(7)(B) ........................................................................ **56**

Fed. R. App. P. 32(f) ........................................................................ **56**

Fed. R. App. P. 32(g) ........................................................................ **56**

Fed. R. App. P. 34(a)(l) ........................................................................ **i**

Fed. R. Civ. P. 56(a) ........................................................................ **17, 18, 25**

## Miscellaneous:

Fair Labor Standards Amendments of 1961, § 9, 75 Stat. 73 ........................ **25**

Fair Labor Standards Amendments of 1966, § 209, 80 Stat. 836 ................... **25**

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal from the January 9, 2023, Stipulated Final Judgment and Specific Reservation of Appellate Rights under 28 U.S.C. § 1291. The Stipulated Final Judgment and Specific Reservation of Appellate Rights expressly recognizes the Schumacher Defendants' intent to appeal from the Stipulated Final Judgment, seeking reversal of the Court's December 20, 2022, Amended Order Granting in Part Appellees' Motion for Summary Judgment and Denying Defendants' Motion for Summary Judgment [ECF No. 167] (the "Amended Summary Judgment Order"). *See Dorse v. Armstrong World Indus., Inc.*, 798 F.2d 1372, 1376–77 (11th Cir. 1986).

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in entering summary judgment for Appellees, and denying the Schumacher Defendants' motion for summary judgment on the ASE, despite a record establishing Appellees were integrally involved with sales and, thus, qualified as salespersons for the statutory exemption.

2.      Whether the district court erred in holding a fair reading of the ASE does not include Appellees even though they were integrally involved in Schumacher Auto's sales process.

3.      Whether the district court erred in holding a fair reading of the 7(i) Exemption does not include Appellees because they were in a physically separate building, even though the department in which they were located was functionally unified with the automotive dealerships and therefore part of Schumacher Auto's retail establishment.

4.      Whether the district court erred in holding the "Fluctuating Workweek Method of Compensation" ("FWW") does not apply to Hollman, despite a record establishing she had a clear understanding her fixed salary constituted compensation (apart from the one-half overtime premium) for all hours worked in a workweek.

2

## STATEMENT OF THE CASE

*A.    Nature of the Case and Course of Proceedings*

On July 12, 2021, Appellees, Spikes, Hollman, and Cortes, filed their Complaint, seeking damages, under the FLSA, of unpaid overtime wages, liquidated damages, benefits tied to wages, pre-judgment interest, attorney's fees, and costs.[2] Doc 1.[3] Appellees sought alleged unpaid overtime for varying time periods of their employment with Schumacher Auto, claiming they routinely worked over forty (40) hours per week without proper pay. *Id.* at Pg 7, ¶¶ 38, 41. On July 27, 2021, the Schumacher Defendants filed their Answer and Affirmative Defenses. Doc 9.[4]

Pertinent to this appeal, the Schumacher Defendants asserted several affirmative defenses, including, *inter alia*:

> As and for their Second Affirmative Defense, and to the extent Plaintiffs were not exempt, Defendants state each Plaintiff was on a "fluctuating workweek" pay plan. Each Plaintiff was given notice of the pay plan, which provided for the payment of a set salary for all hours worked each week, whether few or many, plus a monthly commission. The pay plan contemplated payment at a half-time rate for overtime for any workweeks in which overtime was actually worked. Each Plaintiff

[2]    Plaintiffs Brian Horowitz, and Cameron N. May resolved their claims and are not involved in this appeal.

[3]    The district court docket is cited as "Doc" followed by the corresponding docket entry number. The pages of the numbered docket entries are cited as "Pg" or "Pgs" followed by the corresponding page number(s). Docketed transcripts are cited as "Doc # followed by the corresponding page number(s) and line number(s).

[4]    On April 15, 2022, Appellants filed a motion to make technical corrections to their Answer and Affirmative Defenses. Doc 40.

3

acknowledged their clear understanding of this pay plan.

As and for their Fourth Affirmative Defense, Defendants state each Plaintiff is subject to the exemption listed in 29 U.S.C. § 207(i), also known as 7(i) or the "retail sales exemption." Each Plaintiff worked for the corporate defendant, a retail establishment, each Plaintiff's regular rate of pay at all times exceeded one and one-half times the minimum hourly rate applicable under 29 U.S.C. § 206, and more than one half of each Plaintiff's compensation was represented by commissions on goods and services in a representative period.

As and for their Fifth Affirmative Defense, Defendants state it is exempt from the maximum hour provisions of 29 U.S.C. § 207 because the corporate defendant is a nonmanufacturing establishment primarily engaged in the business of selling vehicles or implements to ultimate purchasers. Each Plaintiff formerly was primarily engaged in the business of selling automobiles (and/or automobile service) pursuant to the corporate Defendant's business model. *See* 29 U.S.C. § 213(b)(10)(A).

Doc 9, Pgs 7-8, ¶¶ 46, 48, and 49.

On March 31, 2022, the district court entered its Order Setting Trial Date, Pretrial Deadlines, and Referral to Magistrate Judge, setting the case for trial during the court's two-week trial calendar beginning on January 2, 2023. Doc 31. On July 29, 2022, Appellees filed their motion for partial summary judgment on, *inter alia*, the applicability of *each* of the asserted affirmative defenses identified above. Docs 106, 107. Also on July 29, 2022, the Schumacher Defendants filed their cross-motion for summary judgment on, *inter alia*, the applicability of *each* of the asserted affirmative defenses identified above. Docs 108, 109. The parties fully briefed the cross-motions. Docs 112, 116, 117, 118, 120, 121, 122, 123 and 136. On December

2, 2022, the district court entered its Order Granting in Part Appellees' Motion for Summary Judgment and Denying Defendants' Motion for Summary Judgment ("Summary Judgment Order"). Doc 147.

The district court's Summary Judgment Order disposed of *both* statutory exemptions asserted by the Schumacher Defendants, granting partial summary judgment to all Appellees as to the applicability of the exemptions. Doc 147, Pg 16. Additionally, as to Appellee Hollman, the district court also granted partial summary judgment to her on the applicability of the FWW, finding she did not have a clear understanding of her pay plan. *Id.*[5]

Because of the district court's ruling, the only remaining issues for trial were Appellees' damage claims, the ancillary issue of willfulness for the damages' limitations period, and Amanda Schumacher's potential individual liability under the FLSA. Ultimately, the district court entered the parties' Stipulated Final Judgment with Specific Reservation of Appellate Rights. Doc 190.

B.    *Statement of Facts*

**Schumacher Auto and its Business Development Center**

Schumacher Auto is a retail automotive dealership selling and servicing cars

---

[5]    The district court later entered its Amended Order Granting in Part Appellees' Motion for Summary Judgment and Denying Defendants' Motion for Summary Judgment ("Amended Summary Judgment Order") to clarify the FWW does not apply to Hollman. Doc 167.

to the public. Doc 109-1, Pgs 31-17-20, 32-14-20; Doc 109-2, Pgs 44-24 – 45-4; Doc 109-3, Pg 60-6-9; Doc 109-4, Pgs 25-1, 26-9-16. At some point prior to Appellees' employment, Schumacher Auto created its Business Development Center ("BDC") to drive customer traffic into the showroom for the specific purpose of selling cars. Doc 109-2, Pg 38-6-16; Doc 109-6, Pgs 96-16 – 97-3, 153-22-24, 154-2-3, 19, 159-2-5. The BDC is an in-house telemarketing sales center staffed and managed by the dealership. Doc 109-9. Due to the recent explosion of internet marketing and the daily use of wireless handheld electronic devices, the BDC has become an essential component of Schumacher Auto's sales and marketing departments, and the auto industry in general. Doc 109-4, Pgs 36-16 – 37-9, 11-12-23, 12-2-7, 34-6-18, 38-3 – 39-8. Appellees are responsible for the development of sales business at every customer touchpoint, and Schumacher Auto's showroom sales are dependent, in part, on Appellees' referrals of potential customers. *Id.*; Doc 109-2, Pgs 134-25 – 135-6.

As it typical in the automotive industry, automobile sales at Schumacher Auto typically are not finalized until the sales manager approves the vehicle pricing; the finance manager determines whether the customer is eligible for financing; and a third-party lender approves the financing or sets conditions for same. Doc 109-2, Pgs 70-13 – 71-2, 72-15 – 73-10; Doc 109-3, Pgs 63-7 – 65-22, 67-5-19; Doc 109-5, Pgs 84-14-20, 164-10-19, 167-2-11; Doc 110-1, Pg 27-20-23. But the process

6

begins with the initial contact with the customer, namely with the BDC Sales Associate soliciting the customer to schedule an appointment to visit the dealership to look at a particular vehicle when the customer schedules an initial appointment; and if the customer is not convinced to come in for an appointment, the sale may never happen. Doc 109-2, Pgs 74-8 – 75-3. The BDC exists to convince customers to schedule appointments to buy (or lease) an automobile, "assist[ing] the customers on their journey to purchase a vehicle." Doc 109-4, Pgs 36-23-24, 11-12-23, 12-2-7, 34-6-18, 38-3 – 39-8; Doc 110-1, Pgs 22-16 – 23-5.

Schumacher Auto evaluates its Showroom and BDC salespersons as a single group and in fact, in 2017 and 2018, Hollman and Cortes ranked as Schumacher Auto's top performing salespersons in that combined group, with Spikes also in the top half. Doc 109-1, Pgs 125-14-22, 153-23 – 154-3; Doc 109-12. In 2018, Hollman was ranked number one, making more money than any other salesperson employed by Schumacher Auto in either group. Doc 109-2, Pg 82-8-25; Doc 109-12.

***Appellants' Employment and the BDC Sales Associate Job Description***

Schumacher Auto employed Cortes from January 2017 until June 2019, when he voluntarily resigned his employment. Doc 109-1, Pgs 91-17-19, 127-2-6. Schumacher Auto employed Hollman from September 2014 until January 19, 2019, when she voluntarily resigned her employment. Doc 109-2, Pgs 83-5-7, 121-20-22. Schumacher Auto employed Spikes from May 2018 to June 30, 2019, when he

7

voluntarily resigned his employment. Doc 109-3, Pgs 19-8-10, 40-5-20.

Cortes readily admitted he understood his job was to assist Schumacher Auto in selling automobiles. *See, e.g.,* Doc 109-1, Pgs 32-21 – 33-3; Doc 109-5, Pgs 145-15-24 ("The BDC department facilitates any sources of customers in their journey to ultimately the sale of a vehicle."), 155-13 – 156-20. He also admitted he knew the exact reason for making appointments for customers was so they may purchase a vehicle. Doc 109-1, Pg 33-3-8. When Hollman applied for the BDC Sales Associate position with Schumacher Auto, she specifically used a resume highlighting her selling abilities and skills, including she was a "persuasive communicator"; used "consultative selling skills to identify opportunities, overcome objections, and build relationships"; and "turned canvassing into sales". Doc 109-10; Doc 109-2, Pgs 57-1 – 58-9, 61-22 -- 62-8. Spikes also admitted he understood he would be talking to customers inquiring about vehicles and his job was to persuade them to make appointments and visit the dealership to purchase or lease a vehicle. Doc 109-3, Pg 21-2-22.

In terms of scheduling customer appointments, Appellees understood their job was to "sell" potential customers to come to the dealership, with the goal the sale of a vehicle. Doc 109-1, Pgs 90-21 – 91-1; Doc 109-4, Pg 35-1-4; Doc 109-6, Pgs 96-16 – 97-3; Doc 109-7, Pg 56-22-25; Doc 110-1, Pgs 22-22 – 23-1. *Cortes characterized this aspect of his job as "__selling__"*. Doc 109-1, Pgs 37-4-6, 67-3-9.

Hollman bragged she was very good at persuading customers to come into the dealership. Doc 109-2, Pg 101-11-13. Simply put, Appellees help the customer on their purchase journey and obtain a "commitment" from a customer to visit the dealership to buy a car. Doc 109-4, Pgs 36-6-8, 40-14 – 44-10, 65-19-23; Doc 110-1, Pg 23-12-25 ("We would do a lot of the work prior to them coming in … we would get them prepared…. We were … like a liaison between the showroom and the customer. We helped them out that way.").

*Training*

Initially, Appellees went through training to learn about the various automobiles Schumacher Auto sells. *See, e.g.,* Doc 109-1, Pg 44-16-25; Doc 110-1, Pgs 22-16 – 23-5, 25-20 – 26-10. *See infra* n. 6. The training, which was ongoing, also involved learning the processes of making phone calls, e-mails to send, and follow-up processes; learning scripts of what to say, including rebuttal arguments; and role-playing to practice making the discussions conversational, all toward the goal of persuading the customer to visit the dealership to buy a vehicle. Doc 109-1, Pgs 47-21-25, 48-8-18, 60-22 – 62-11; Doc 109-2, Pgs 63-10 – 64-23, 102-6 –103-2; Doc 110-1, Pg 26-20-22; Doc 109-11.

Because the whole point of the BDC is to convince potential customers to make appointments and ultimately buy a car, Schumacher Auto emphasized following the written scripts when calling potential customers. Doc 109-2, Pgs 30-

7-19, 68-5-7, 69-17 – 70-5; Doc 109-6, Pg 153-4-10; Doc 110-1, Pg 26-20-22; *see, e.g.*, Doc 109-11. To promote making sales appointments, Schumacher Auto required Appellees learn and memorize these scripts, which were based on professionally persuasive sales skills and techniques, and were designed to help develop rapport and build value with customers who are in various stages of the car-buying process. Doc 109-1, Pg 144-13-24; Doc 109-4, Pgs 49-17 – 50-1; Doc 109-5, Pgs 82-17 – 83-6; Doc 109-6, Pgs 96-16 – 97-3; Doc 109-7, Pg 56-22-25; Doc 109-9. The scripts were designed to try to develop efficiency in terms of getting customers in the door for the purpose of purchasing cars. Doc 109-1, Pgs 48-19 – 49-1; Doc 109-4, Pg 54-1-15; Doc 110-1, Pgs 23-12-25, 26-20-22; Doc 109-11.

### General Job Duties and Responsibilities of the BDC Sales Associate

Pursuant to the written job description, Appellees handle customer contacts; follow-up with customers; *develop new business*; receive and promptly *respond to inbound sales calls and internet inquiries*; identify client needs and *schedule appointments for the sales department*; place outbound phone calls and emails to potential clientele; ensure client concerns are addressed prior to appointment date such as *vehicle pricing, product availability, vehicle equipment questions, appointment process/duration*, etc.; contact clients prior to appointment date to confirm appointments; *prospect for sales opportunities*; execute prospect follow-up calls and gauge customer satisfaction; and attend and participate in department

meetings. Doc 109-1, Pgs 146-25 – 148-1; Doc 109-5, Pgs 82-17 – 83-6, 155-13 – 156-20, 165-3-10; Doc 109-6, Pgs 96-16 – 97-3; Doc 109-7, Pg 56-22-25; Doc 110-1, Pg 23-12-25; Doc 109-9. Cortes admitted he is "sure" he would have read the BDC Sales Associate Job Description. Doc 109-1, Pgs 142-2 – 143-9.

For most of Appellees' employment, Schumacher Auto located the BDC, including the Appellees, in a building next door to its West Palm Beach auto dealership, within walking distance. Doc 109-1, Pg 35-2-9. This allowed Appellees to meet with customers for whom they scheduled an appointment during the car buying process. Doc 109-5, Pg 87-7-13. In practice:

• Appellees *attended mandatory sales department meetings at the dealership*. Doc 109-1, Pgs 35-15-22, 36-8-16, 46-13-25;

• Appellees interacted "as needed" with other sales associates, sales managers, and business development managers, at least on a weekly basis. Doc 109-1, Pg 144-5-12; Doc 109-5, Pgs 168-17 – 169-10; Doc 110-1, Pg 27-2-16;

• Appellees answered customers' questions about the vehicles, such as whether all colors were available, whether the car had premium features, like a sunroof or leather, whether the car came in manual or automatic transmission (V-8 or V-6 engine, for example), whether the car came with Bluetooth, *etc*. Doc 109-1, Pgs 52-2-17, 67-11 – 68-15, 148-12-15; Doc 109-3, Pgs 43-20 – 44-2; Doc 109-4, Pg 34-

11

23-25; Doc 109-5, Pgs 155-13 – 156-20;[6]

- Appellees scheduled the customer appointments with the Schumacher Auto Sales Manager, who then assigned the customer to another Showroom salesperson. Doc 109-1, Pgs 41-14 – 42-4; Doc 110-1, Pg 23-12-25;

- Appellees provided information to Schumacher Auto relating to the appointments, including the potential customer's name, the type of vehicle in which the potential customer is interested, and whether the potential customer wishes to purchase or lease. Doc 109-1, Pg 40-2-19;

- Appellees confirmed the sticker price of a vehicle if the customer asked. Doc 109-2, Pg 78-18-20; Doc 109-4, Pg 64-15; Doc 110-1, Pgs 27-2-16, 28-8-10;

- Appellees sometimes took credit card deposits over the phone. Doc 109-2, Pgs 148-20 – 149-14; Doc 109-5, Pgs 82-17 – 83-6, 155-13 – 156-20; Doc 110-1, Pgs 27-24 – 28-6;

- Appellees entered notes into the computer regarding the customers' needs to relay to the sales manager, maintaining this information on leads in Schumacher Auto's customer management database. Doc 109-1, Pgs 55-22 – 56-2; Doc 109-2, Pgs 105-21 – 106-20; Doc 109-5, Pgs 168-17 – 169-10; Doc 110-1, Pgs 56-1-5, 68-11-24, 69-1-7;

---

[6]    Appellees sometimes even work with brand "OEMs," or manufacturers, taking online tests to become brand certified. Doc 110-1, Pgs 9-18 – 10-4, 10-16-19, 11-14-22, 12-3-24.

- At the direction of the BDC Director, if potential customers for whom Appellees scheduled an appointment did not purchase a car, Appellees followed up with the customer to attempt to make an appointment for them at one of the other "rooftops" within the Schumacher Auto brand. Doc 109-1, Pgs 43-19 – 44-10, 53-20 – 54-14, 55-12-17; Doc 109-3, Pgs 25-11-17, 27-6-11;

- Appellees sometimes called the potential customer more than once. Doc 109-1, Pgs 50-5-8;

- Appellees also responded to customer inquiries via email regarding vehicles in which the customers expressed interest. Doc 109-1, Pgs 65-11-20.

***Pay and Hours***

Schumacher Auto compensates its sales force, including Appellees, with incentive pay in the form of "gross commissions," based on the price of the vehicle, and "flat commissions," which are specified dollar amounts. Doc 109-4, Pgs 48-1-7, 110-5-23; Doc 109-5, Pgs 78-17 – 80-15.[7] Appellees were incentivized to make as many appointments as possible because "the more you sell, the more people show," and the better potential for sales to result from those appointments. Doc 109-

---

[7] Schumacher Auto uses the terms "bonus," "commission," and "incentive pay" interchangeably in terms of the productivity-based element of its pay plans applicable to salespersons, including Appellees; the payments are not discretionary, but are based on objective criteria related to the scheduling of an appointment and sale of a vehicle. Doc 109-4, Pg 109-13-25; Doc 109-6, Pg 97-4-6; Doc 109-7, Pg 56-22-25; Doc 109-14; 109-15; 109-16; 109-17; 109-18.

13

1, Pgs 106-7 – 107-8, 110-13-17; Doc 109-2, Pgs 97-25 – 98-18, 119-13-18.

Appellees were paid every other week, pursuant to a written pay plan. Doc 109-1, Pgs 78-9-16; Doc 109-2, Pg 33-7-18; 109-13; 109-14; 109-15; 109-16; 109-17; 109-18; 109-29. The "Pay Plan for New Hires" provided for compensation to Appellees of (a) the equivalent of a $2,000.00 monthly salary, (b) a flat-rate bonus/commission for each appointment scheduled, conditioned upon the customer showing up for the appointment ($20.00), and (3) an additional flat-rate bonus/commission for each appointment leading to the sale of a vehicle ($20.00). Doc 109-14; 109-17; 109-18. Schumacher Auto also increased the commission amount for all vehicles sold during a month to $21.00 per vehicle if more than twenty (20) vehicles were sold, and then again to $35.00 per vehicle if more than thirty-five (35) vehicles were sold; Schumacher Auto even applied the increases retroactively to all sales (not just those over the threshold) so long as the thresholds were achieved. *Id.*; Doc 109-1, Pgs 95-19 – 98-24, 99-10-25, 106-2-6; Doc 109-2, Pgs 42-2-16, 111-12-22, 112-24 – 114-8; Doc 109-4, Pg 49-8-15; Doc 109-7, Pgs 51-22 – 52-22, 82-9-19, 148-6-12; Doc 110-1, Pgs 20-13-20, 21-1-13.

As of April 1, 2017, the BDC Sales Associate pay plan changed slightly; the monthly guaranteed salary component remained the same, as did the application of the FWW compensation method, but the commission bonuses for appointments shown decreased from $20.00 to $15.00 and the sales thresholds increased for

purposes of the higher retroactively-paid commission increases; at the same time, though, a further incentive payment was included for "BD Agent of the Month," based on productivity. Doc 109-1, Pgs 137-4 – 138-11; Doc 109-2, Pgs 111-11-23, 112-24 – 113-2; Doc 110-1, Pgs 20-13-20, 21-1-13; Doc 109-16; Doc 109-29.

Every pay period (bi-monthly), regardless of the number of hours worked, Appellees received, at a minimum, their guaranteed salary of at least $923.07, based on the monthly salary rate equivalent of $2,000.00. Doc 109-1, Pgs 79-7 – 82-7, 100-4-9, 103-18-23; Doc 109-2, Pgs 88-21 – 89-2, 151-15 – 152-7; Doc 109-5, Pg 111-17-20; Doc 109-7, Pgs 51-22 – 52-22, 82-9-19, 148-6-12; Doc 109-8, Pgs 48-18-21, 98-24 – 99-5; Doc 109-14; 109-15; 109-16; 109-17; 109-18; Doc 109-19; Doc 109-20; Doc 109-21; Doc 109-22; Doc 109-23.

Additionally, on or around the 10th day of the successive month, Appellees received their commission for the preceding month, a productivity-based amount relating to (a) the number of customers who visited the dealership for a scheduled appointment made by Appellees, and (b) the number of vehicles the sales team sold because of Appellees' generated appointments. Doc 109-1, Pgs 78-17 – 79-2, 87-9 – 88-3, 101-1-6, 105-6-12; Doc 109-2, Pgs 33-7-18, 88-21 – 89-2, 124-19-21; Doc 109-3, Pg 37-4-6; Doc 109-8, Pgs 51-6-9, 69-23 – 70-7, 99-2-5; Doc 109-7, Pgs 51-22 – 52-22, 82-9-19, 148-6-12; Doc 110-1, Pg 69-1-7; *see*, *e.g.*, Doc 109-24; Doc 109-25; Doc 109-26.

15

Up until November 2018, Schumacher Auto also paid Appellees a separate amount of overtime compensation for any hours worked more than forty during any of the workweeks in the preceding month; the overtime pay was calculated at a premium half-time rate, considering the guaranteed salary *and* commission payments already paid. Doc 109-1, Pg 105-13-15; Doc 109-2, Pgs 34-16-21, 88-21 – 89-2; Doc 109-7, Pgs 51-22 – 52-22, 82-9-19, 148-6-12; Doc 109-8, Pgs 51-10-19, 69-23 – 70-7, 71-11 – 72-1, 75-14-18, 76-22-24, 86-9-18, 103-12-22; Doc 109-14; 109-17; 109-18.

The overtime paid to Appellees up until November 2018 was pursuant to the alternative FWW method of compensation. Doc 109-4, Pgs 100-14 – 101-4; Doc 109-7, Pgs 51-22 – 52-22, 82-9-19, 148-6-12; Doc 109-8, Pgs 88-23 – 89-5; Doc 109-14; 109-17; 109-18. Under that method, Appellees understood their monthly guaranteed salary and monthly commissions represented their straight time pay for all hours worked each workweek and they would receive additional half-time premium pay for any hours worked in excess of 40 (based on an increased regular rate calculated by dividing the guaranteed salary plus commissions each workweek by the total number of hours worked). Doc 109-1, Pgs 134-20 – 136-9; Doc 109-2, Pg 152-5-17; Doc 109-7, Pgs 51-22 – 52-22, 82-9-19, 148-6-12; Doc 109-8, Pgs 33-13-23, 34-3-10, 139 -9 – 146-6, 151-8-23, 157-5 -- 158-19; Doc 109-14; 109-17; 109-18.

16

At least up until November 2018, Appellees do not genuinely dispute the accuracy of their hours worked, as recorded on Schumacher Auto's time records. Doc 109-1, Pg 124-5-18; Doc 109-2, Pg 138-2-12. A fair representative period of Appellees' compensation is a month, *see, e.g.,* Doc 109-2, Pg 124-11-21, which correlates with the frequency Schumacher Auto paid commissions to them. *See* Doc 109-1, Pgs 78-17 – 79-2, 87-9 – 88-3, 101-1-6, 105-6-15; Doc 109-2, Pgs 33-7-18, 88-21 – 89-2, 124-19-21; Doc 109-3, Pg 37-4-6; Doc 109-14; 109-17; 109-18; Doc 109-24; 109-25; 109-26.

Significantly, more than half of Appellees' total monthly pay, generally speaking, was incentive-based commission pay. Doc 109-1, Pg 125-1-5, Doc 109-2, Pg 122-14-25; Doc 109-31; 109-32; 109-33. When those commissions are included, Appellees' r*egular hourly rate of pay* exceeded $10.88, which is one and one-half times the *federal* minimum wage rate of $7.25. Doc 109-2, Pg 126-10-12; *see, e.g.,* Doc 109-31; 109-32; 109-33.

C.   *Standard of Review*

This Court reviews, *de novo*, the district court's Amended Order on Summary Judgment. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11ᵗʰ Cir. 2012). Summary judgment is appropriate *only* if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Strickland*, 692 F.3d at 1154. This Court must draw all

reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations, which "'are jury functions, not those of a judge.'" *Strickland*, 692 F.3d at 1154, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Ultimately, the Court must decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

A determination regarding the appropriate level of deference accorded to an agency regulation is a question of law, and questions of law are reviewed *de novo*. *Buckner v. Fla. Habilitation Network, Inc.*, 489 F.3d 1151, 1154 (11th Cir. 2007).

## SUMMARY OF THE ARGUMENT

The district court erred as matter of law in finding Appellees not integrally involved with sales and thus not salespersons under the Automobile Sales Exemption, 29 U.S.C. § 213(b)(10) ("ASE"). The district court repeatedly cited and relied upon *disputed* issues of fact in its Amended Order on Summary Judgment in finding Appellees were not salespeople, even though it found "no question that [Appellees'] jobs provided support to the salespeople. . . ." The district court failed to cite to record evidence to the contrary, submitted by the Schumacher Defendants, despite acknowledging any determination under the ASE requires a factual determination of exactly what each Appellee's job responsibilities were.

The district court's narrow interpretation of the ASE is contrary to binding Supreme Court and former Fifth Circuit Court of Appeals precedent holding it is not necessary to demonstrate Appellees *actually sold* automobiles so long as their job duties were *integral to the sales process*. The record evidence establishes Appellees *were* integrally involved in the sales process and, in fact, the driving force behind the customer's car-buying journey. The district court's conclusion Appellees do not actually sell automobiles, while at the same time unequivocally finding they *aided in and supported the sales of automobiles*, is faulty considering the nature of the automotive sales process, which depends not only on the sales manager's approval of the vehicle price, but additionally on third-party lender financing contingencies,

19

and in fact does not "close" until long after the involvement of many different dealership employees, including the Appellees.

Based on the record evidence below, a fair reading of the ASE either entitles the Schumacher Defendants to summary judgment on the ASE or at a minimum, creates a genuine dispute as to whether the Appellees' job duties constitute selling for purposes of the ASE because they are integrally involved in the sales process.

The district court further erred in holding the 7(i) Retail Sales Exemption, 29 U.S.C. § 207(i) ("7(i) Exemption"), did not apply to Appellees because they were in a physically separate building, even though the department in which they were located was functionally unified with the automotive dealerships and therefore part of Schumacher Auto's retail establishment. The district court ignored 29 C.F.R. 779.355 *and* the record evidence demonstrating the functional unity between the BDC and Schumacher Auto's commonly owned and operated retail automotive dealerships.

The BDC is neither a separate entity nor establishment. Appellees were employed and paid by Schumacher Auto, and all vehicle sales, and wage and hour, records are located on one centralized system. Neither *Chevron* nor *Skidmore* deference compels the district court's finding the BDC did not have a retail concept simply because it was not physically located at the dealership.

20

Based on the record evidence below, a fair reading of the 7(i) Exemption entitles the Schumacher Defendants to summary judgment in their favor, but at a minimum, binding precedent establishes the district court must consider whether the BDC (and Appellees) were functionally unified with Schumacher Auto's retail automotive dealerships before eliminating the 7(i) Exemption defense simply based on physical distinction.

Finally, the district court erred in holding the Fluctuating Workweek Method of Compensation ("FWW") did not apply to Hollman despite her pay records establishing she knew she received the same amount of base pay each payroll period, despite the varying number of hours worked each workweek. The district court disregarded the "regular lesson" Hollman received each and every pay period, in the form of her paychecks, confirming she received the same amount of base pay each and every payroll period, despite the varying number of hours worked each workweek. There is no genuine dispute of material fact Hollman had a clear understanding her base salary remained the same regardless of how many hours she worked, be it over or under 40 hours per workweek. At a minimum, and since it is Hollman's burden to show Schumacher Auto failed to administer the FWW Method properly as to her pay, the district court must permit a finder of fact to determine whether Hollman had the requisite understanding of her pay, for purposes of the application of the FWW pay methodology.

21

The Stipulated Final Judgment should be reversed with directions to vacate the Amended Summary Judgment Order and enter summary judgment in favor of the Schumacher Defendants on the ASE, the 7(i) Exemption, and, with respect to Hollman, the FWW method of compensation. Alternatively, the Stipulated Final Judgment should be reversed with directions to vacate the Amended Summary Judgment Order and proceed to trial accordingly.

## ARGUMENT

### I.    FLSA exemptions must not be narrowly, but *fairly*, construed.

For almost 75 years, district courts *narrowly* construed the FLSA's exemptions because of its "humanitarian and remedial" purpose. *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945). But, as this Court has observed, the Supreme Court recently corrected course and held the exemptions should be interpreted *fairly*, not narrowly. *Ramirez v. Statewide Harvesting & Hauling, LLC*, 997 F.3d 1356, 1359 (11th Cir. 2021), citing *Encino Motorcars, LLC v. Navarro*, —— U.S. ——, 138 S. Ct. 1134, 1142-43 (2018) ("Even if Congress did not foresee all of the applications of the statute, that is no reason not to give the statutory text a fair reading."). Now it is clear "exemptions are as much a part of the [Act's] purpose as the overtime-pay requirement." *Hernandez v. Plastipak Packaging, Inc.*, 15 F.4th 1321, 1329-30 (11th Cir. 2021), citing *Encino Motorcars*, 138 S. Ct. at 1142.

The FLSA was enacted in 1938 for "the prime purpose of … aid[ing] the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 698, 707 n. 18 (1945); *Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1332 (11th Cir. 2014). Congress intended it to protect all covered workers from oppressive working hours and ensure they would receive "[a] fair day's pay for a fair day's

23

work[.]". *Barrentine v. Arkansas-Best Freight Sys.*, 450 U.S. 728, 739 (1981); 29

U.S.C. § 202(a).

While the FLSA generally requires employers to pay overtime to covered

employees who work more than 40 hours a week, it exempts certain categories of

employees from that requirement. *See Fowler v. OSP Prevention Grp., Inc.*, 38 F.4th

103 (11th Cir. 2022), citing 29 U.S.C. §§ 207(a), 213. The employer has the burden

of showing the exemption applies. *Corning Glass Works v. Brennan*, 417 U.S. 188,

196–97 (1974) (stating generally "the application of an exemption under the Fair

Labor Standards Act is a matter of affirmative defense on which the employer has

the burden of proof"); *Diaz v. Jaguar Rest. Grp., LLC*, 627 F.3d 1212, 1214–15 (11th

Cir. 2010) (describing the administrative exemption as an affirmative defense to an

FLSA claim).

Under the applicable standard, whether Schumacher Auto "classified" or

"reclassified" Appellees as exempt or non-exempt during their employment is

irrelevant, because an employee's exemption from overtime depends only upon his

or her job duties and/or pay methodology. *See Ehrlich v. Rich Products Corporation*,

767 Fed. Appx. 845, 850 n.3 (11th Cir. 2019). Moreover, whether an employee is

exempt is determined by his or her actual work activities, not by either party's

characterization of those activities. *See Pendlebury v. Starbucks Coffee Co.*, No. 04-

80521-CIV, 2008 WL 763213, at *6 (S.D. Fla. Mar. 13, 2008).

24

II.    **The district court erred in entering summary judgment for Appellees, and denying the Schumacher Defendants' motion for summary judgment, on Appellees' status as salespersons under the ASE or, alternatively, the court erred in ruling as a matter of law given the factual disputes.**

A district court ruling on a summary judgment motion must view all evidence and draw all reasonable inferences *in favor of the nonmoving party*, and may not weigh evidence or make credibility determinations, which "'are jury functions, not those of a judge.'" *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate *only* if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Strickland*, 692 F.3d at 1154.

Employees at car dealerships have long been among those exempted from overtime pay under the ASE. 29 U.S.C. § 213(b)(10)(A). In fact, Congress initially exempted *all* employees at car dealerships from the overtime-pay requirement. *See* Fair Labor Standards Amendments of 1961, § 9, 75 Stat. 73. Congress then narrowed that exemption to cover "*any* salesman, partsman, or mechanic *primarily engaged in selling* or servicing automobiles, trailers, trucks, farm implements, or aircraft." Fair Labor Standards Amendments of 1966, § 209, 80 Stat. 836.

In 1974, Congress enacted the version of the exemption at issue here. It provides the FLSA's overtime pay requirement does not apply to "any salesman,

25

partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers." 29 U.S.C. § 213(b)(10)(A).

The first section of the district court's Amended Order on Summary Judgment, titled "*Undisputed* Material Facts," explains in a footnote that the "Court omits record citations to the facts that the parties have *not* disputed." Doc 167, Pg 2. Throughout the "*Undisputed* Material Facts," the district court *includes* record citations to facts that are *in dispute*.

For example, the district court states: "*According to Victor Ruiz*," the BDC Director from April 2018 to July 2019, "[Appellees'] primary function was to schedule appointments; [Appellees] were not authorized to engage in the sale of any vehicles. (Ruiz Decl. ¶¶ 10-11)." *Id.*, Pg 3. The district court also cites to Ruiz' testimony as support for certain other *disputed facts*, such as "[Appellees] did not show cars, did not meet with customers, did not accept deposits from potential customers,[8] and did not deliver vehicles to customers. (*Id.* ¶ 9)." *Id.*

Ultimately, the district court concluded, "missing from … [Appellees'] job

---

[8]    Schumacher Auto submitted *direct evidence* to the contrary, that Appellees sometimes took credit card deposits over the phone. Doc 109-2, Pgs 148-20 – 149-14; Doc 109-5, Pgs 82-17 – 83-6, 155-13 – 156-20; Doc 110-1, Pgs 27-24 – 28-6.

26

duties is selling automobiles, and, *while there is no question that [Appellees'] jobs provided support to the salespeople*, [Appellees] were not salespeople, as required by the statute." ECF No. 167, Pg 8. While that may be Ruiz' testimony, the district court may not assign more weight to it than any other piece of evidence at the summary judgment stage. Instead, the court is charged with determining whether the record contains sufficient evidence creating a genuine dispute. It does.

Contrary to the court's conclusion, that disputed evidence includes Appellees' written job description, which Cortes admitted accurately described the job duties and responsibilities of Appellees. ECF No. 109-1, Pgs 143-4 -- 148-15. Pursuant to that written document, ECF 109-1, Appellees handle customer contacts; follow-up with customers; develop new business; receive and promptly respond to inbound *sales calls* and internet inquiries; *identify client needs* and scheduling appointments for the *sales department*; place outbound phone calls and emails to potential clientele; ensure client concerns are addressed prior to appointment date such as *vehicle pricing, product availability, vehicle equipment questions, appointment process/duration*, etc.; contact clients prior to the appointment date to confirm appointments; prospect for *sales* opportunities; execute prospect follow-up calls and gauge *customer satisfaction*; and attend and participate in sales department meetings. Doc 109-1, Pgs 146-25 – 148-1; Doc 109-5, Pgs 82-17 – 83-6, 155-13 – 156-20, 165-3-10; Doc 109-6, Pgs 96-16 – 97-3; Doc 109-7, Pg 56-22-25; Doc 110-

1, Pg 23-12-25; Doc 109-9.

According to one witness, who also works for Schumacher Auto as a BDC Sales Associate, the BDC exists to convince customers to schedule appointments to buy (or lease) cars. Doc 110-1, Pgs 22-16 – 23-5. Appellees' own admissions are also enough to at least create a genuine factual dispute, particularly with reference to the Ruiz testimony cited by the district court. Cortes readily admitted he absolutely understood his job was to assist Schumacher Auto in selling automobiles. *See, e.g.,* Doc 109-1, Pgs 32-21 – 33-3; Doc 109-5, Pgs 145-15-24 ("The BDC department facilitates any sources of customers in their journey to ultimately the sale of a vehicle."), 155-13 – 156-20. Cortes also admitted he knew the exact reason for making appointments for customers was so they may purchase a vehicle. Doc 109-1, Pg 33-3-8.

In terms of scheduling customer appointments, *Cortes characterized this aspect of his job as **"selling"***. Doc 109-1, Pgs 37-4-6, 67-3-9. Spikes admitted he understood he would be talking to customers inquiring about vehicles and his job was to persuade the customer to make an appointment and show up to the dealership. Doc 109-3, Pg 21-2-22. And when Hollman applied for the BDC Sales Associate position with Schumacher Auto, she specifically used a resume highlighting her *selling* abilities and skills, including she was a "persuasive communicator"; used "consultative selling skills to identify opportunities, overcome objections, and build

28

relationships"; and "*turned canvassing into sales*". Doc 109-10; Doc 109-2, Pgs 57-1 – 58-9, 61-22 -- 62-8. She even bragged she was very good at persuading customers to come into the dealership. Doc 109-2, Pg 101-11-13. The fact is, Appellees readily understood their job was to "sell" coming to the dealership, with the goal ultimately being the sale of a vehicle (and for which they were highly incentivized compensation-wise). Doc 109-1, Pgs 90-21 – 91-1; Doc 109-4, Pg 35-1-4; Doc 109-6, Pgs 96-16 – 97-3; Doc 109-7, Pg 56-22-25; Doc 110-1, Pgs 22-22 – 23-1.

In addition, the district court cites to the testimony of Cortes and Hollman as evidence Appellees did not give pricing information to customers. Doc 167, Pg 3. But the Schumacher Defendants submitted competing evidence demonstrating Appellees confirmed the sticker price of a vehicle if the customer asked. ECF No. 109-2, p. 78-18-20; ECF No. 109-4, p. 64-15; ECF No. 110-1, pp. 27-2-16, 28-8-10. Critically, only Schumacher Auto's sales managers have the authority to approve the price of a vehicle (other than sticker) given to a customer. ECF No. 109-5, p. 81-10-15; ECF No. 110-1, p. 27-2-16. Moreover, the Schumacher Defendants submitted evidence BDC Sales Associates, like Appellees, sometimes took credit card deposits over the phone, as even Hollman admits. ECF No. 109-2, pp. 148-20 – 149-14; ECF No. 109-5, pp. 82-17 – 83-6, 155-13 – 156-20; ECF No. 110-1, pp. 27-24 – 28-6. *Supra* n. 8 and accompanying text.

Conspicuously absent from the district court's Amended Summary Judgment

Order is any reference to the Schumacher Defendants' sworn answers to interrogatories, submitted at Doc 109-13, in which they described Appellees' job duties: "Business Development Center ("BDC") employees are responsible for the development and retention of *sales and service business* at every customer touchpoint. BDC employees are part of the *sales department*, reporting to the sales management … ensur[ing] client concerns are addressed prior to appointment date *such as vehicle pricing* …." *Id.*, Pgs 3-4. The district court subsequently admitted, "In order to determine whether Appellees fall into either the Automobile Sales Exemption or the Retail Sales Exemption requires a determination of <u>*exactly what each Appellees' job responsibilities were*</u>. *This is a question of fact*." [ECF No. 180]. Yet, again, the district court concluded, "missing from … [Appellees'] job duties is selling automobiles, and, *while there is no question that [Appellees'] jobs provided support to the salespeople*, [Appellees] were not salespeople, as required by the statute." ECF No. 167, Pg 8.

The Schumacher Defendants believe the record evidence, *see supra* pp. 10-13, entitles them to summary judgment in their favor on the exemptions and the district court erred in ruling against them. But, at a minimum, a genuine dispute exists as to whether Appellees' job duties fall within the parameters of the ASE, as recently interpreted by the Supreme Court. *See infra* Section III; *Strickland*, 692 F.3d at 1154 ("[A district court] must consider all evidence in the record when reviewing

a motion for summary judgment ... and can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists"); *Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1266 n. 1 (11th Cir. 2006) ("Credibility determinations at the summary judgment stage are impermissible."). *See also* Doc 180, Pg 2 (the district court subsequently noting whether Appellees fall within *either* exemption "requires a determination of *exactly* what each Appellees' job responsibilities were. *This is a question of fact, not law*.")

**III.    The district court erred in holding a fair reading of the ASE does not include Appellees even though they were *integrally involved* in the *sales process*.**

The district court's error in ruling against the Schumacher Defendants on the ASE is compounded by the fact the ruling is contrary to *binding* Supreme Court and former Fifth Circuit precedent holding it is *not necessary* to demonstrate Appellees *actually sold automobiles* as part of their job duties, so long as Appellees' job duties were *integral to the sales process*. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1140 (2018); *Brennan v. Deel Motors, Inc.*, 475 F. 2d 1095, 1098 (5th Cir. 1973). On the record evidence below, Appellees' claim their job duties were not at least integral to the sales process is disingenuous, as even the district court recognized and acknowledged Appellees "aided in and supported the sales of automobiles." ECF No. 167, pp. 9-10.

Shortly after its enactment, the former Fifth Circuit had occasion to consider

31

application of the ASE, noting it "was an implicit recognition by Congress of the incentive method of remuneration for salesmen. . . ." *Brennan v. Deel Motors, Inc.*, 475 F. 2d 1095, 1098 (5th Cir. 1973).[9] In *Deel Motors*, the issue was whether automobile "service salespeople" were within the scope of the automobile sales exemption. *Id*. at 1096. The court acknowledged the relevance of incentive compensation to the exemption analysis, noting the service salespeople "receive a substantial part of their remuneration from commissions and therefore are more concerned with their total work product than with the hours performed." *Id*. at 1097. Here, significantly more than half of Appellees' total monthly pay was incentive-based commission pay. Doc 109-1, Pg 125-1-5, Doc 109-2, Pg 122-14-25; Doc 109-31; 109-32; 109-33.

In holding these "service salespeople" exempt, the court found while they *did not actually sell or service any vehicles*, they did "work as an integrated unit, performing the services necessary for the maintenance of the customer's automobile," summarizing:

> In the absence of clear intent to the contrary, we cannot assume that Congress intended to treat employees with functionally similar positions differently, especially when the exemption by its own terms refers to "any salesman . . . engaged in selling or servicing automobiles . . ." This is exactly what a service salesman does. They promote and attempt to sell the goods and services provided by Deel. Their

---

[9]    Decisions of the former Fifth Circuit rendered prior to close of business on September 30, 1981, are binding. *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

remuneration is substantially based on their success in these endeavors. They openly solicit business by telephone and through written circulars to prospective and past customers. Their hours may be irregular, depending on the special needs of their customers.

*Deel Motors*, 475 F.2d at 1097–98.

Similarly, here, whether selling cars outright or selling appointments to potential customers by discussing the customer's needs and the available vehicles at the dealership, the primary, if not exclusive, duty of the Appellees was to assist the dealership in selling automobiles. Based on the record evidence, Appellees primarily engaged in selling vehicles as much as the Showroom salespersons who assisted customers on the showroom floor, before handing them off to a sales and finance manager to finalize the transaction due to the legal papers involved in consummating the sale. Doc 109-2, Pgs 70-13 – 71-2, 72-15 – 73-10; Doc 109-3, Pgs 63-7 – 65-22, 67-5-19; Doc 109-5, Pgs 84-14-20, 164-10-19, 167-2-11; Doc 110-1, Pg 27-20-23.

The *Deel Motors* court may have been prescient, as 50 years later, in 2018, the Supreme Court had occasion to clarify the broad reach of the ASE, holding in *Encino Motorcars, LLC v. Navarro*, "service advisors" at a car dealership are exempt under the ASE as *salespersons* primarily engaged in servicing vehicles. 138 S. Ct. 1134, 1140 (2018). There was no dispute the service advisors at issue did "*not* spend most of their time *physically repairing* automobiles." *Id*. at 1140-41. But instead, they "mee[t] customers; liste[n] to their concerns about their cars; sugges[t] repair and maintenance services; sel[l] new accessories or replacement parts; recor[d]

33

service orders; follo[w] up with customers as the services are performed . . . and explai[n] the repair and maintenance work when customers return for their vehicles." *Id*. at 1140. The Court held "the phrase 'primarily engaged in . . . servicing automobiles *must include some individuals* who <u>*do not*</u> *physically repair automobiles* themselves but who are <u>*integrally involved*</u> *in the servicing process*." *Id*. at 1141. And just as the service advisors acted as a conduit between the customer and service technician, relaying the information regarding the service the customer needed, Appellees acted as a conduit between the customer and Showroom salespersons, relaying the information regarding the customer and the customer's vehicle interest(s) for purposes of continuing the sales process.

The factual record in this case clearly illustrates while Appellees may not "close" vehicle sales, neither may *Showroom* salespersons, yet as BDC Sales Associates, Appellees undisputedly are *integrally involved in the sales process*. Indeed, BDC Sales Associates are the driving force behind every step of the customer's car-buying journey until they hand the customer off to the dealership. *See supra* pp. 10-13. And *Encino Motorcars* rejected the longstanding principle FLSA exemptions should be construed narrowly: "Because the FLSA gives no 'textual indication' that its exemptions should be construed narrowly, 'there is no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation.'" *Id*. at 1142. According to the Court, FLSA exemptions are as much

34

a part of the FLSA's purpose as the overtime-pay requirement and therefore the Court has no license to give the exemption anything but a fair reading." *Id*. Indeed, the Court acknowledged "the entire exemption bespeaks breadth," because "[i]t begins with the word 'any'. . . [and] uses the disjunctive word "or" three times." *Id*. *Encino Motorcars* mandates the use of a common-sense, functional approach that would hold these Appellees exempt as integrally involved in the automotive sales process.

The district court's conclusion Appellees do not "sell," and are simply "appointment setters," in practice, not only is contrary to established precedent, but also illogical. Under the FLSA's exemptions, the focus is on the Appellees' *actual job duties*, not the labels they place on themselves. *See Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1269 (11th Cir. 2008) ("We have rejected a categorical approach to deciding whether an employee is an exempt executive….."). Regardless of title or how they referred to themselves, how they characterize their job duties, or for that matter how Victor Ruiz or anyone else characterized their job duties, Appellees were integrally involved in Schumacher Auto's automotive sales process.

Just as the Supreme Court fairly read the exemption to include individuals who do not *physically repair* automobiles themselves but who are *integrally involved in the servicing process*, so too must this Court fairly read the exemption to include Appellees, who are *integrally involved in the sales process*. After *Encino*

*Motorcars*, excluding Appellees from the ASE would penalize Schumacher Auto's decision to evolve with the internet age and shift its sales process away from traditional "brick and mortar" to more of an internet-based approach.

District courts in this Circuit have had little trouble interpreting the ASE broadly enough to encompass categories of automotive dealership employees who do not necessarily perform "actual" mechanical work or physical repairs of the type normally performed by service technicians, but "functioned within" the service department by performing pre-delivery inspections of vehicles. *See, e.g., Viart v. Bull Motors, Inc.*, 149 F. Supp. 2d 1346, 1348-49 (S.D. Fla. 2001) (applying exemption to "get-ready" mechanics, specifically noting they were paid on a flat rate commission basis, and therefore more concerned with their total output than with hours worked).

Most significantly, as was the case in *Viart*, Appellees' pay was highly incentivized. In addition to a guaranteed monthly salary equivalent of $2,000.00, Schumacher Auto paid Appellees a flat-rate bonus/commission payment based on the number of customers who showed up for appointments they made. Further, Schumacher Auto paid an additional flat-rate bonus/commission payment based on the number of vehicles sold because of those appointments. And finally, Schumacher Auto even further incentivized Appellees by paying, retroactive to the first sale, an increased commission if certain monthly target thresholds were exceeded. Again,

significantly more than half of Appellees' total monthly pay was incentive-based commission. Doc 109-1, Pg 125-1-5, Doc 109-2, Pg 122-14-25; Doc 109-31; 109-32; 109-33.

Like the service salesmen in *Deel Motors* and *Viart*, Schumacher Auto incentivized Appellees to concern themselves more with the number of appointments made and vehicles sold because of their efforts, rather than the number of hours they worked. Appellees were incentivized to make as many appointments as possible because "the more you sell, the more people show," and the better potential for sales to result from those appointments. Doc 109-1, Pgs 106-7 – 107-8, 110-13-17; Doc 109-2, Pgs 97-25 – 98-18, 119-13-18. Considering the Appellees' incentive compensation structure and overall job duties, it is clear Appellees are precisely the type of employee Congress intended to exempt through the ASE.

The district court's conclusion Appellees do not "actually" sell automobiles also is faulty, considering the unique nature of what constitutes the "actual" sale of an automobile. Unlike the sale of many retail products or services, automotive sales typically involve a sales *process,* and, depending on third-party lender financing contingencies, the deal may not be considered actually "closed" until long after the involvement of many different dealership employees, from BDC Sales Associates, like Appellees, to Showroom salespersons, Sales Managers and Finance Managers; in the case of a "spot delivery" or "conditional sale," and in the TILA context, this

37

Circuit has even acknowledged the validity of a financing contingency as a "condition precedent." *See*, *e.g.*, *Chastain v. N.S.S. Acquisition Corp.*, No. 08-81260-CIV, 2009 WL 1971621, at *4 (S.D. Fla. July 8, 2009), *aff'd*, 378 F. App'x 983 (11th Cir. 2010)); *King v. King Motor Co. of Fort Lauderdale*, 900 So. 2d 619, 622 (Fla. 4th DCA 2005); *Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1066–68 (11th Cir. 2004) (automotive sale is not final until the purchaser signs the sales contract); *Owens v. Samkle Auto. Inc.*, 425 F.3d 1318, 1323 (11th Cir. 2005) (noting all the legal requirements of the "sale" of an automobile). Along these lines, Schumacher Auto directed the district court to another Supreme Court case, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012). In *Christopher*, the Court considered the applicability of a *related* sales exemption (the "outside sales" exemption) to a prescription drug company's pharmaceutical representative, whose job was to "provide information to physicians about the company's products in hopes of persuading them to write prescriptions for the products in appropriate cases." *Id*. at 150.

Like Appellees, the pharmaceutical representatives in *Christopher* do not technically "sell," but rather obtain a *nonbinding commitment* from the physician to prescribe those drugs in appropriate cases. *Id*. at 151. Notwithstanding the difference between the ASE and the outside sales exemption, the Court was faced with the same question of what constitutes "selling" for purposes of fairly applying an FLSA

38

exemption in the twenty-first century, ultimately holding the representatives exempt as outside *salespersons*. *Id*. at 165–66.

Finally, *Brown v. Nexus Business Solutions, LLC*, 488 F. Supp. 3d 1287 (N.D. Ga. 2020), is particularly instructive. There, on summary judgment, the district court considered the application of several exemptions to a position extremely like that of the Appellees here; in fact, the *Brown* employees were called "business development managers". *Id*. at 1292. Like Appellees here targeted individuals in hopes of convincing them to schedule an appointment to buy a car from Schumacher Auto, the *Brown* employees targeted businesses in hopes of convincing them to purchase vehicles for their fleets from GM dealers. *Id*. Like Appellees here, the *Brown* employees used literal scripts and canned presentation material to develop business leads and opportunities for the dealership. *Id*. at 1303.

But, unlike the district court below, the *Brown* court recognized *Encino Motorcar*'s "common-sense, functional approach" to interpreting the "broad reach of the automobile sales exemption" would hold plaintiffs exempt because they "are integrally involved in the sales process." *Id*. at 1307.[10] *See also Modeski v. Summit*

---

[10]    The *Brown* employees were not exempt because the employer was not a *retail* dealership selling to ultimate purchasers and did not *otherwise* meet the definition of a qualifying establishment. *Id*. at 1307 (N.D. Ga. 2020), *aff'd*, 29 F.4th 1315 (11th Cir. 2022). This case logically extends *Brown*, since Schumacher Auto *is* a retail dealership selling to ultimate purchasers. There is little question the *Brown* court would have granted the Appellees summary judgment under these facts.

39

*Retail Solutions, Inc.*, 470 F. Supp. 3rd 93, 101-109 (D. Mass. 2020) (Commission-based "Brand Representatives," who performed marketing services using company-taught selling techniques to persuade customers to buy products, "in some sense" made sales -- "tantamount" to a "paradigmatic" sale in the "particular industry").

Even if, as the district court concluded, Appellees merely "aided in and supported the sale of automobiles," after *Encino Motorcars*, the record evidence below either entitles the Schumacher Defendants to summary judgment on the ASE or, at a minimum, creates a genuine dispute as to whether Appellees' job duties constitute "selling" under the ASE, as interpreted by *Encino Motorcars*, because they are "integrally involved" in the sales process. The district court even admitted: "In order to determine whether Appellees fall into either the Automobile Sales Exemption or the Retail Sales Exemption requires a determination of *exactly what each Appellees' job responsibilities were*. *This is a question of fact*." [ECF No. 180]. The district court's Amended Order on Summary Judgment is in error.

**IV.** **The district court erred in holding a fair reading of the 7(i) Exemption does not include Appellees because they were in a physically separate building, even though the department in which they were located was functionally unified with the automotive dealerships and therefore part of Schumacher Auto's retail establishment.**

The 7(i) Exemption applies to employees employed by a retail or service establishment whose regular rate of pay exceeds one and one-half times the minimum hourly rate and for whom more than half of the employee's compensation

for a representative period (not less than one month) consists of commissions on

goods or services. 29 U.S.C. § 207(i); 29 C.F.R. § 779.412. The 7(i) Exemption was

enacted to relieve an employer from the obligation of paying overtime compensation

to certain employees of a retail or service establishment paid wholly or in greater

part based on commissions. 29 C.F.R. § 779.414. One court has explained the

exemption is aimed at benefitting both employers and employees:

> [7(i)] was designed to address inequities that can arise in paying
> overtime to commissioned employees. And *Encino* [*Motorcars'*] "fair
> reading" rings true here, as *[the employees']* "rights" are not the only
> ones at issue and, in fact, are not always separate from and at odds with
> *their employers'* interests.

*Sec'y U.S. Dep't of Labor v. Bristol Excavating, Inc.*, 935 F.3d 122, 135 (3rd Cir.

2019), citing *Encino Motorcars*.

Importantly, the 7(i) Exemption is an example of an FLSA exemption that

depends on the *character* of the *establishment* <u>by which an employee is employed</u>.

Other exemptions establish two criteria, the character of the establishment and the

nature of the conditions of the employment of the particular employee. *See*, *e.g.*, 29

C.F.R. § 779.302. But because Schumacher Auto itself is a retail seller of

automobiles, unlike the ASE, whether Appellees themselves "sell" is of no

consequence for purposes of the 7(i) Exemption; <u>*"any employee" of Schumacher*</u>

<u>*Auto who meets the compensation requirements is exempt*</u>. *See Gieg v. DDR, Inc.*,

407 F.3d 1038, 1047 (9th Cir. 2005) (recognizing retail nature of auto dealership and

the relevant inquiry is not whether the transactions on which an employee worked should be deemed to be retail, but whether the dealership's sales of automobiles should be deemed to be retail). So, while Appellees may, inaccurately, dispute they "sell" for purposes of the ASE, they cannot genuinely dispute "automobile sales" are recognized as retail sales by the automotive industry and the FLSA itself. *Id*. at 1049 ("By its terms, [7(i)] applies to '*any employee*' of a retail or service establishment who meets the compensation requirements; the exemption is *not limited to those employees who sell retail goods and services*."); *see also* 29 C.F.R.§ 779.308 (employee must be employed by his employer in the work of the exempt establishment itself in activities within the scope of its exempt business).

The Department of Labor has issued lengthy interpretive regulations to further define a "retail or service establishment." *Selz v. Investools, Inc.*, No. 2:09-CV-1042-TS, 2011 WL 285801, at *3 (D. Utah Jan. 27, 2011), citing 29 C.F.R. §§ 779.313-.321 and 779.339-.341). In determining how much deference courts should give to regulations promulgated by federal agencies, there are two principal lines of cases. *Id*. Under the more deferential line, courts apply what has been termed "*Chevron* deference." *Id.*, citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

In applying *Chevron* deference, courts "must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute." *Id.*

42

*Chevron* deference "is warranted if 'Congress delegated authority to the agency generally to make rules carrying the force of law' and the agency's interpretation of the statute was issued pursuant to that authority." *Id.* Congressional delegation "may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.'" *Id.*

The less deferential line of deference is referred to as *Skidmore* deference. *Id.*, citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 138 (1944). In applying *Skidmore* deference, courts will consider a regulation's persuasive authority insofar as it is persuasive; the regulation will not carry the force of law. *Id.* "With Skidmore deference, the weight to be given the agency's practice in particular circumstances depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade....'" *Id.*

When considering the "retail or service establishment" requirement of § (7)(i), courts have varied in applying *Chevron* or *Skidmore* deference to the DOL regulations. *Id.*; *compare Martin v. Refrigeration School, Inc.*, 968 F.2d 3, 5 (9th Cir. 1992) (applying *Chevron* deference) *with Reich v. Delcorp, Inc.*, 3 F.3d 1181, 1186 (8th Cir. 1993) (applying *Skidmore* deference and not following the position consistently taken by the DOL in published regulations and opinion letters). The

43

regulations themselves suggest *Skidmore* deference is appropriate at 29 C.F.R. § 779.9 (2010). *English v. Ecolab, Inc.*, 2008 WL 878456, at *7 (S.D.N.Y., March 31, 2008).

Moreover, the regulations *were not subject to* notice-and-comment rulemaking. *Id.* And the text of the FLSA did not expressly delegate rulemaking authority to the DOL. *Id.*[11] Applying *Skidmore* deference, at least one district court found the persuasive value of the regulations to be minimal in the context of 7(i), and particularly noting the impact of the Internet on retail sales industries:

> The regulations in large part were *not drafted* for 7(i) but for the now repealed § 213(a). *Id.* Because § 213(a) has been repealed, the regulations *have not been updated* to reflect the impact of the Internet on retail and service industries. *Id.* Today, nearly every retail establishment offers its products for sale via the Internet. Additionally, the Internet has made it possible for small start-up companies *to market* their products and services at a minimal cost and to a broader group than was previously possible. In sum, the Internet has fundamentally changed what is considered a "retail or service establishment," and insofar as the DOL regulations do not take this into account they are not a persuasive interpretation of the FLSA.

*Selz v. Investools, Inc.*, 2011 WL 285801, at *4 (D. Utah, Jan. 27, 2011).

Appellees and the district court incorrectly relied on 29 C.F.R. §§ 779.23 and 779.303 in concluding the 7(i) Exemption does not apply because the BDC was a

---

[11] Congress expressly delegated rulemaking authority for other provisions of the FLSA but did not do so regarding the definition of "retail or service establishment." *See Clements v. Serco, Inc.*, 530 F.3d 1224, 1226–27 (10th Cir. 2008) (citing 29 U.S.C. § 213(a)(1)) (noting Congress delegated authority for the Secretary of Labor to define the "outside salesmen" exemption).

distinct physical place of business from the Schumacher Auto dealerships. Doc 167, Pgs 11-12 ("no sales took place at the BDC; there were no vehicles or other items for sale that were located at the BDC and any vehicle sales took place at Defendants' dealerships…. It is at the dealerships, not the BDC where the automobiles are sold to the public at the very end of the stream of distribution."). Based on this conclusion, the district court erroneously agreed with Appellees and concluded further the BDC is *not* a retail establishment itself and accordingly denied the Schumacher Defendants the applicability of the 7(i) Exemption to Appellees' employment.

But the district court ignored 29 C.F.R. § 779.305, which sheds further light on when physically separated portions of a business may constitute more than one establishment:

> [T]wo or more physically separated portions of a business … may constitute more than one establishment for purposes of exemptions … if they are engaged in operations which are functionally separated from each other…. [T]he retail portion of an establishment would be considered a separate establishment … if (a) It is physically separated from the other activities; *and (b) it is functionally operated as a separate unit having separate records, and separate bookkeeping; and (c) there is no interchange of employees between the units.*

On this point, the Schumacher Defendants submitted more than sufficient evidence below demonstrating the obvious functional unity between Schumacher Auto's BDC and its commonly owned and operated automotive dealerships. Schumacher Auto's BDC is neither a separate "entity" nor an "establishment". Appellees, as BDC employees, were employed and paid by *Schumacher Auto* – not the BDC (because

45

the BDC simply is a "department" of Schumacher Auto). *See* Doc 103-9. Schumacher Auto also maintains its vehicle sales records, as well as employee wage and hour records, *on one centralized system*, regardless of where the employees were located. *Id.*

In addition, as part of their job duties, Appellees regularly attended sales meetings at Schumacher Auto's West Palm Beach automotive dealership, which was right next door -- within walking distance -- to the BDC building. Doc 109-1, p. 35-2-9, 15-22; 36-8-16; 46-13-25. And in evaluating its sales personnel, as the Schumacher Defendants explain above, Schumacher Auto treats its BDC salespeople and its Showroom salespeople as one group. In fact, in 2017 and 2018, Hollman and Cortes ranked as Schumacher Auto's top performing salespersons for the combined group, and Spikes also was in the top half. Doc 109-12.

Hollman admitted both Charles and Amanda Schumacher regularly appeared at the BDC to "control and direct the affairs of the employees." Doc 106-6, Pg 4 (Sworn Answer to Interrogatory No. 6). Spikes and Cortes both admitted both Charles and Amanda Schumacher are involved in the day-to-day operations of Schumacher Auto, including the operations and payroll of the BDC. Doc 106-7, Pg 4 (Sworn Answer to Interrogatory No. 6); Doc 106-8, Pg 4 (Sworn Answer to Interrogatory No. 6) ("Of course they were our employers, they were present *in the dealership*, their name is on the building and all things related to working there.").

46

Schumacher Auto's dealerships even shared employees from time to time, as evidenced by Hollman's temporary transfer from the West Palm Beach BDC location to the Delray Beach dealership location in October 2015. Doc 109-2, pp. 93-8 – 94-16; Doc 109-30.

Based on this evidence, and for purposes of the 7(i) Exemption, the Schumacher Defendants argued the BDC clearly was part of an inseparable whole, notwithstanding the physical separation. Because Schumacher Auto's BDC and its automotive dealerships are functionally intertwined, that Appellees were in a physically separate building is a red herring. An establishment "does not have to be actually frequented by the general public in the sense that the public must actually visit it and make purchases of goods or services on the premises in order to be considered as available and open to the general public." 29 C.F.R. § 779.319.

In addition, the Schumacher Defendants cited binding precedent holding physically separated entities *may nonetheless be considered* a "single [retail] establishment" so long as the entities demonstrate "functional unity". *See Mitchell v. T. F. Taylor Fertilizer Works*, 233 F.2d 284 (5th Cir. 1956) (recognizing two separate corporations operated as one entity); *Mitchell v. Gammill*, 245 F.2d 207 (5th Cir. 1957).

The district court, however, found these cases "misplaced" because they were decided before the regulations were first adopted in 1970. But since 1970, this Court

47

has cited, with approval, yet another former Fifth Circuit case holding "functional unity" is "normally invoked to show that two or more places of business which are physically separated *should be considered a single establishment*". *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1158 (11ᵗʰ Cir. 2008), citing *Montalvo v. Tower Life Bldg.*, 426 F.2d 1135, 1144–45 (5ᵗʰ Cir. 1970); *see also Gieg v. DDR, Inc.*, 407 F.3d 1038, 1047 (9ᵗʰ Cir. 2005) (recognizing retail nature of auto dealership and stating the relevant inquiry is not whether the transactions on which an employee worked should be deemed to be retail, but whether the *dealership's sales of automobiles* should be deemed to be retail).

When read *en toto*, even the applicable regulations do not unambiguously support the district court's finding the BDC did not have a retail concept because it was not located at a dealership. While the Schumacher Defendants believe that they are entitled to summary judgment in their favor on the 7(i) Exemption, binding precedent clearly establishes the district court also should have conducted an analysis of whether Schumacher Auto's BDC and its dealership were functionally intertwined before eliminating the 7(i) Exemption defense altogether. *See Feagley v. Tampa Bay Downs, Inc.*, 2012 WL 2178857, at *5 (M.D. Fla., June 13, 2012) (at the summary judgment stage, to show the existence of *separate* establishments, there must both be physical *and functional* separation).

48

**V.    The district court erred in holding the FWW did not apply to Hollman based on its conclusion she did not have the requisite understanding regarding her pay structure.**

Generally, the FLSA requires employers to pay an employee one and one-half times the employee's "regular rate" for all hours worked in excess of 40 hours. 29 U.S.C. § 207(a)(1). The "regular rate" is the hourly rate at which the employer pays the employee for normal, non-overtime hours in a 40–hour workweek. *See Walling v. Youngerman–Reynolds Hardwood Co.*, 325 U.S. 419 (1945). In the case of an employee who is paid a constant weekly salary for fluctuating hours, the Supreme Court has found it acceptable to calculate the regular rate by dividing that weekly salary by the number of hours actually worked. *See Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1310–11 (11ᵗʰ Cir. 2013), citing *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 580 (1942). This has come to be known as the "fluctuating workweek method." *Id.*

After *Missel* was decided, the Department of Labor ("DOL") promulgated 29 C.F.R. § 778.114, an interpretive rule setting forth the fluctuating workweek method. *Id.* Subsection (a) of the rule explains where the fluctuating workweek method is used to calculate the employee's regular rate of pay, "[p]ayment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement." *Id.; see also Hernandez v. Plastipak Packaging, Inc.*,

49

15 F.4th at 1326-27; *Garcia v. Yachting Promotions, Inc.*, 662 Fed. Appx. 795, 796-97 (11th Cir. 2016). Notably, the fluctuating workweek method is merely one way to meet the FLSA's overtime requirements — it is not an exception to those requirements. *Lamonica*, 711 F.3d at 1311. Consequently, the *underline: employee bears the burden* of proving the employer failed to properly administer the payments. *Id.*

The Department of Labor's regulations permitting the fluctuating workweek to be implemented require four criteria be met:

(1) the employee clearly understands the straight-salary covers whatever hours he or she is required to work;

(2) the straight-salary is paid irrespective of whether the workweek is one in which a full schedule of hours are worked;

(3) the straight-salary is sufficient to provide a pay-rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours worked is greatest; and

(4) in addition to straight-salary, the employee is paid for all hours in excess of the statutory maximum at a rate not less than one-half the regular rate of pay.

*See* 29 C.F.R. § 778.114.

In considering the FWW method of payment on summary judgment, the district court analyzed *only* the "clear understanding" element, finding the FWW method of payment applied to Cortes and Spikes, but not to Hollman:

The record indicates that both Spikes and Cortes understood that their salaries covered all hours worked and that they would receive half-time for any hours over forty. As his deposition, Cortes testified that he understood that he would receive half time pay for all overtime.

50

> Additionally, both Spikes and Cortes signed documents setting out the pay plan, explaining the payment method, and explicitly stating that overtime would be paid at ½ the regular rate. *However, there is <u>no record evidence</u> that Hollman and Defendants had a mutual understanding regarding the pay structure of the FWW.* Thus, Plaintiff Hollman is entitled to summary judgment holding that the FWW does not apply to her for the pre-November 2018 period.

Doc 167, Pg 14. That finding is in error.

In support of her motion for partial summary judgment, Hollman submitted Schumacher Auto's check reports for her entire employment history. Doc 103-9. These check reports show Hollman received the same amount of base pay ($923.07) each payroll period. *Id.* The check reports also show the number of hours Hollman worked each pay period, including overtime hours. *Id.* The base pay was constant although the number of hours varied each pay period. Around the 12th of the next consecutive month, Schumacher Auto reconciled the previous month's incentive pay due to Hollman, based on the number of appointments scheduled and automobiles sold as the result of those scheduled appointments during the previous month, and paid her additional incentive pay *<u>and</u>* (until November 2018) an additional amount of overtime pay, at a premium rate of one-half her increased regular rate of pay. *Id.*

As aptly stated by the Fourth Circuit, and recognized by this Court, Hollman "received a regular lesson — in the form of [her] paychecks — about how the fluctuating workweek plan operates." *Davis v. Friendly Exp., Inc.*, No. 02-14111, 2003 WL 21488682, at *2 (11th Cir. Feb. 6, 2003), citing *Griffin v. Wake County*,

142 F.3d 712, 716–17 (4th Cir. 1998). While Hollman now may claim, for purposes of her position, confusion existed about how actual calculations were made, that claim casts no shadow on the underlying understanding the fixed salary constituted compensation (apart from the one-half overtime premium) for all hours worked in a workweek, whatever their number. *Davis*, *supra*, citing *Bailey v. County of Georgetown*, 94 F.3d 152, 156 (4th Cir.1996) ("Neither the regulation nor the FLSA in any way indicates that an employee must also understand the manner in which his or her overtime pay is calculated"); *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 636–37 (5th Cir. 2001) (limiting the required "clear mutual understanding" to the specific elements stated in the regulation); *cf. Rene v. Fulton County School District*, Case No. 1:19-CV-04721-WMR, 2020 WL 7496841, *3 (11th Cir., Nov. 2, 2020) ("[a]n employee *does not have to understand every contour* of how the fluctuating work week method is used to calculate salary, so long as the employee understands that his base salary is fixed regardless of the hours worked."); *Griffin*, 142 F.3d at 716 ("Further, the FLSA *does not require that the employees consent* to the fluctuating work week method; they must simply understand its basic mechanics.").

While Hollman may not have *signed* the same *exact* pay policy as Cortes and Spikes,[12] her check reports evidence her knowledge of Schumacher Auto's payment

---

[12]    Strangely, notwithstanding the specific finding Spikes and Cortes had a clear understanding of the FWW pay plan and it was applicable to them, the district court

to her of a fixed base salary ($923.07 each pay period) that compensated her for whatever hours she worked during the pay period – including hours over the regular 40 (or 80 considering the bi-monthly pay period). *Compare Davis v. Friendly Express, Inc.*, No. 02-14111, 2003 WL 21488682, at *2 (pay stubs showed the constant base amount of pay and number of hours worked that varied from week to week), *with Lewis v. Keiser Sch., Inc.*, No. 11-62176-Civ., 2012 WL 4854724, at *5 (S.D. Fla. Oct. 12, 2012) (pay stubs did not show the number of hours worked or the base amount of pay). Here, there is no genuine dispute of material fact Hollman had the necessary clear understanding her base salary remained the same regardless of how many hours she worked, be it over or under 40 hours a week. At a minimum, though, in light of Hollman's check reports, and particularly since it is her burden to show Schumacher Auto failed to administer the FWW method properly as to her, the district court should have denied the cross-motions for summary judgment and allowed a jury to determine whether Hollman had the necessary "clear understanding" for purposes of Schumacher Auto's FWW pay methodology.

## CONCLUSION

For the foregoing reasons, the Stipulated Final Judgment should be reversed with directions to vacate the Amended Summary Judgment Order and enter

---

denied Appellants' motion for summary judgment on this issue, without any apparent rationale.

summary judgment in the Schumacher Defendants' favor on the ASE, the 7(i) Exemption, and, with respect to Hollman, the FWW method of compensation.

Alternatively, the Stipulated Final Judgment should be reversed with directions to vacate the Amended Summary Judgment Order and proceed to trial.

Respectfully submitted,

Padula Bennardo Levine LLP
Attorneys for Appellants
3837 NW Boca Raton Blvd.
Suite 200
Boca Raton, Florida 33431
Telephone:  (561) 544-8900
Facsimile:   (561) 544-8999

By:  _____
DANIEL R. LEVINE, ESQ.
Fla. Bar No. 0057861
E-Mail:  DRL@PBL-Law.com
ROBIN I. FRANK, ESQ.
Fla Bar No. 0649619
E-Mail:  RIF@PBL-Law.com
ALEX B.C. ERSHOCK, ESQ.
Fla. Bar No. 100220
E-Mail:  ABE@PBL-Law.com

**and**

Birnbaum, Lippman & Gregoire, PLLC
Attorney for Appellants
1301 E. Broward Blvd.
Suite 230
Fort Lauderdale, Florida 33301
Telephone:  (954) 617-2300
Facsimile:   (954) 617-2313


By:    */s/ Nancy W. Gregoire Stamper*
　　　　NANCY W. GREGOIRE STAMPER, ESQ.
　　　　Fla. Bar No. 475688
　　　　E-Mail:  nwg@kblglaw.com


**and**


Law Office of Richard Ivers
Attorney for Appellants
6131 Lyons Road
Suite 201
Coconut Creek, Florida 33073
Telephone:  (954) 757-6262
Facsimile:   (954) 757-6594


By:    */s/ Richard A. Ivers*
　　　　RICHARD A. IVERS, ESQ.
　　　　Fla. Bar No. 890261
　　　　E-Mail:  richard@iverslawfirm.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify this document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,862 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14 Times New Roman.

Padula Bennardo Levine LLP
Attorneys for Appellants
3837 NW Boca Raton Blvd.
Suite 200
Boca Raton, Florida 33431
Telephone:  (561) 544-8900
Facsimile:   (561) 544-8999

By: _____
DANIEL R. LEVINE, ESQ.
Fla. Bar No. 0057861
E-Mail:  DRL@PBL-Law.com

Dated:  March 28, 2023

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY on March 28, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the Service List below via transmission of Notices of Electronic Filing generated by CM/ECF.

_____
DANIEL R. LEVINE, ESQ.

57

## SERVICE LIST

| | |
|---|---|
| Catherine A. Cullen, Esquire<br>E-Mail:  ccullen@cullenlawfirm.net<br>Mark A. Cullen, Esquire<br>E-Mail:  mailbox@cullenlawfirm.net<br>Cullen Law Firm, P.A.<br>Clearlake Plaza<br>500 S. Australian Avenue, Suite 543<br>West Palm Beach, FL  33401<br>Telephone:  (561) 640-9191<br>Facsimile:   (561) 214-4021<br>Counsel for Appellees<br>*Via CM/ECF* | Daniel R. Levine, Esquire<br>E-Mail:  DRL@PBL-Law.com<br>Robin I. Frank, Esquire<br>E-Mail:  RIF@PBL-Law.com<br>Alex B.C. Ershock, Esquire<br>E-Mail:  ABE@PBL-Law.com<br>Padula Bennardo Levine, LLP<br>3837 NW Boca Raton Blvd., Suite 200<br>Boca Raton, FL  33431<br>Telephone:  (561) 544-8900<br>Facsimile:   (561) 544-8999<br>Counsel for Appellants<br>*Via CM/ECF* |
| | Nancy W. Gregoire Stamper, Esquire<br>E-Mail:  mwg@kblglaw.com<br>Birnbaum, Lippman & Gregoire, PLLC<br>1301 E. Broward Blvd., Suite 230<br>Fort Lauderdale, FL  33301<br>Telephone:  (954) 617-2300<br>Facsimile:   (954) 617-2313<br> Counsel for Appellants<br>*Via CM/ECF* |
| | Richard A. Ivers, Esquire<br>E-Mail:  richard@iverslawfirm.com<br>Law Office of Richard Ivers<br>6131 Lyons Road, Suite 201<br>Coconut Creek, FL  33073<br>Telephone:  (954) 757-6262<br>Facsimile:   (954) 757-6594<br> Counsel for Appellants<br>*Via CM/ECF* |